12 U.S. 335
 8 Cranch 335
 3 L.Ed. 581
 THE FRANCES, BOYER, MASTER. (Thompson and al. Claimants.)
 Feb. 1, 1814
 
 1
 THIS was an appeal from the sentence of the United States'
 
 
 2
 Circuit Court of the district of Rhode Island.
 
 The facts were as follow:
 
 3
 War was declared by the United States against Great Britain on the 18th of June, 1812.
 
 
 4
 The ship Frances, having on board a cargo of goods of British manufacture, consigned to various persons in the United States, sailed from Greenoch, in Scotland, on the 19th of July, in the same year, for New York. On the 28th day of August following, she was captured by the Yankee privateer, and carried into the district of Rhode Island, where the cargo was libelled as enemy property.
 
 
 5
 Robert and James Thompson and William Steele, naturalized citizens of the United States, claimed a considerable part of this cargo as their own property; and also claimed 130 packages, another part of the same cargo, as being owned by them jointly with British subjects, or as having a lien upon the property in consequence of advances made upon the consignment.
 
 
 6
 These goods were all consigned by James Thompson, a naturalized citizen of the United States, residing in Scotland, to William Steele, a citizen of the United States, carrying on the business of the concern in New York.
 
 
 7
 All the goods claimed, except the 130 packages, were incontestibly the property of the Claimants; and, on the trial, restoration of two thirds was decreed to Robert Thompson and William Steele, residents in the United States; in which decree the captors acquiesced. The remaining third, which belonged to James Thompson, who resided in Scotland, was condemned: and from this sentence he has appealed to this Court.
 
 
 8
 The 130 packages were also condemned as enemy property; and from this sentence the Claimants have appealed to this Court; but, having received more full information than they originally possessed respecting the ownership of these goods, they now abandon their claim as to this property, except as to 66 boxes, of which they still claim to hold a moiety; the other moiety being acknowledged to be the property of Messrs. Dalgleish and Frame, British subjects.
 
 
 9
 A claim to all the above mentioned goods was also interposed by the United States, for a violation of the non-intercourse laws: which claim was rejected in the Circuit Court, and an appeal taken to the Supreme Court.
 
 
 10
 James Thompson, as appeared from the evidence, was a native of Scotland, and came to the United States in the year 1793, where he resided, carrying on trade and commerce, till the year 1801. In 1797 he was naturalized. In the year 1801 he went to France, on the commercial business of his house, and, some time afterwards, passed over to England, where he was employed in making purchases for and shipments to his house. In the year 1803 he settled in Glasgow, where he continued doing that part of the business of the partnership which was to be transacted in Great Britain, until the declaration of war. After the knewledge of that event, he transacted no commercial business whatever, and was exclusively employed in arranging his affairs in such manner as would enable him to return to the United States. This being accomplished, he, in August, 1813, engaged a passage on board the cartel ship the Robert Burns, about to sail from Liverpool to New York, but was stopped by the orders of government. He then passed over to Ireland, and privately embarked for the United States, where he arrived in November last. Several affidavits were taken to show that he always considered the United States as his permanent place of residence, and that he uniformly expressed his determination to return. His letters manifested the same intention. It also appeared that his business was complicated, and required his attention after he ceased to engage in new adventures; but it did not appear that he had performed any act which could be considered as commencing to return, until August 1813, when he engaged a passage on board the Robert Burns.
 
 
 11
 As to the 66 boxes of merchandize, the moiety of which was still claimed by Robert and James Thompson and William Steele, they prayed, on bringing up the cause to this Court, to be allowed to make further proof of their property in the said goods; and offered, as further proof, the affidavit of James Thompson that they were the joint property of the house of Dalgleish and Frame and of Messrs. Thompsons and Steele, under a contract made by two letters which were exhibited, and which he said were original. In addition to this, James Thompson swore that he gave his bill for the moiety of these goods, which bill he had paid, and that he was prevented from notifying this contract to his partners in his letter to them, by the hurry produced by the shipment. The Claimants offered, also, the affidavit of William Steele, stating that, some time after the papers of the ship Frances were opened, he received the invoice and letters annexed to his affidavit in an envelope with some other papers. That the letters were in the hand-writing of John Frame and James Thompson. That, before he received them, he was convinced, from the marks, that the goods in the invoice were, in some respects, the joint property of his house and of Dalgleish and Frame; which fact he stated to the agents of the captors as well as the judge of the Circuit Court, at the trial in June, 1813; and that James Thompson was in the habit of taking goods on joint account from houses in Scotland, and sending them to the house in America, without specifying whether they were on joint account or on commission.
 
 
 12
 The letters referred to, were, one from Dalgleish and Frame, dated Glasgow, 27th June, 1812, and addressed to Mr. James Thompson, Glasgow, in which they say the goods were printed in consequence of his orders; and express a hope that he will take the whole contained in the invoice; or, if not, that he will allow them to go to his house on joint account. The other was a letter addressed to Messrs. Dalgleish and Frame, signed James Thompson, and dated Glasgow, 1st July, 1812, in which he acknowledges the receipt of their letter of the 27th of June, 1812, and says, that as there are a great many more goods in the invoice than he had ordered, and as he did not wish to take to large a quantity, he would send them on joint account.
 
 
 13
 The invoice, or rather bill of parcels, is dated Glasgow, 27th of June, 1812, and was headed 'Messrs. R. and J. Thompson and W. Steele bought of Dalgleish and Frame.'
 
 
 14
 The affidavit of John Frame, taken in Glasgow, was also exhibited, in which he swears that the goods are the joint property of Messrs. R. and J. Thompson and Wm. Steele and of Dalgleish and Frame.
 
 
 15
 Such was the further proof offered.
 
 
 16
 In the Frances were two letters from James Thompson to Wm. Steele. The first was dated Glasgow, July 13th, 1812, in which he says 'I annex a list of goods consigned by the Frances. These consignments are the safest and surest trade for us, and it was from this conviction that I allowed of so many consignments.' In the annexed list of consignments, referred to in the foregoing letter, were the goods shipped by Messrs. Dalgleish and Frame. In this letter, he writes on the business of the house, speaks of the consignments generally, recommends that the goods should be promptly sold at the market price, and accounts of sales returned; but makes no allusion to any interest in the goods of Dalgleish and Frame.
 
 
 17
 IRVING, for Appellants, after stating the facts of the case, and the claim of Robert and James Thompson and William Steele, contended,
 
 
 18
 That British property shipped on board an American vessel, before a knowledge of the war, was not liable to capture, either under the laws of the United States or the president's instructions to the commanders of privateers. That the commissions issued by the president to the private armed vessels of the United States, only authorized them to seize, 1st. British vessels and the property found on board: 2d. All property liable to capture by the laws of war; and that the property, in the present case, did not come under either of these descriptions. Acts of congress of June 18th, and June 26th, 1812, Laws U. S. vol. 11, p. 227 and 238. See, also, the instructions of the president to the private armed vessels of the United States.
 
 
 19
 Enemies' property in possession of the nation declaring war, at the time of the declaration, is not liable to seizure as prize of war: it can only be sequestered by municipal regulation. The Court having jurisdiction in cases of this kind, sits as a municipal, not as a prize Court. 1 Rob. 238, The Rebeckah. 5 Rob. 207, The Boeders Lust. 2 Azuni, 224.
 
 
 20
 The property, in the present case, is to be considered as committed to the public faith. The circumstances under which it was shipped, and afterwards sailed, were very peculiar. The non intercourse act and the several acts supplementary thereto, the revocation of the French decrees, the president's proclamation of 2d November, 1810, the letter of the American secretary of state (Mr. Monroe) to Mr. Foster, the British minister, under date of July 26th, 1811, the revocation of the British orders in council, and the assurances of Mr. Russel, the American charge d'affaires in Great Britain, presented a state of things on which the British merchants, and the American merchants in Great Britain, confidently relied for the security of their property shipped, under these circumstances, to the United States.
 
 
 21
 This doctrine, that the property of an enemy, found in the country at the breaking out of a war, is under the safe-guard of the public faith, is a principle of the common law. In England, property in this situation would not be condemned. Enemy goods which came down the Baltic, and were landed in England before a knowledge of the war, have been there held to be safe. Magna charta itself recognizes the principle. By the rule of reciprocity, therefore, protection ought to be extended by the American government to the property now in dispute.
 
 
 22
 It is said that we have not a standing in Court, that James Thompson is an alien enemy, and that an alien enemy cannot support a claim of this kind. But we say that, admitting James Thompson to be an alien enemy, his agent in this country may have a standing in Court, if the property in question be divested of its hostile character, which we contend is the case here. 5 Rob. Nostra Madonna delle Gracie. 6 Rob. 1. id. 21, The Marianne. 2 Rob. 135, The Packet de Bilboa.
 
 
 23
 But if these goods be hostile property, and the Claimants, on that account, have no right to them, still, we contend, the captors cannot support their claim: The property of the goods, if not in the Claimants, is in the United States, and liable to seizure under the non-intercourse act of March 1, 1809; which act is neither repealed by nor merged in the act declaring war, nor any other act. Laws U. S. vol. 9, p. 243, § 5, § 8, and § 18, of the act. The 3d sect. of the prize act, (Laws U. S. vol. 11, p. 239,) requires that all the laws of the United States, then in force, be observed by the owners, officers and crews of privateers. The non-intercourse act was one of the laws of the United States then in force. The second set of instructions to the privateers of the United States, (issued 26th August, 1812,) interdicts the capture of American vessels having on board British goods: They are to be seized by the collectors of the respective ports. The United States have always asserted their prior right to such property. (See the circular letter from the comptroller of the treasury, of October 16th, 1812.) They have chosen to municipalize it—to reserve it to themselves Congress has resisted every attempt to the repeal the non-intercourse. The act of July 13th. 1813, (Laws U. S. vol. 12, p. 14.) shows that the United States have not relinquished their claim to property situated like that now in dispute. Their relinquishment only goes to such property as should be condemned as prize of war.
 
 
 24
 As to the first instructions of the president, they only authorize the private armed vessels of the United States to capture enemy property on board neutral or hostile vessels, and not that found on board American vessels returning to the United States, flying before the storm of war, and seeking the protection of their country. See the circular letter of Mr. secretary Gallatin, of 26th August, 1812. The second set of instructions, before referred to, prohibit the capture of American vessels returning to the United States with British property suipped after the repeal of the orders in council, and before the declaration of war was known in England. These instructions were operative as soon as issued, and were the law for all the privateers of the United States. They made a cessation of hostilities as to the property above described; which if thereafter captured by a privateer, would be restored to the owners. The captors would only be relieved from the payment of damages and costs. 2 Azuni, 229, 230, 355, 263.—2 Dallas, 40. Bain v. Schr. Speedwell.—1 Rob. 154. The Mentor.
 
 
 25
 We would now, on behalf of the Claimants, move the Court to allow us further proof as to the ownership of the property. We wish to show that the goods are not, in truth, consigned property, but that one moiety belongs to the Claimants. We wish to explam the papers which the captors have considered as proving the property in question to be hostile. That we have a right to make this explanation, we refer the Court to the following cases. 6 Rob. 3.—id. 132, W. and J. Bells case.—4 Rob. 161. Maddonna delle Gracie.—id. 21. The Josephine.—3 Rob. 268. The Sarah.—That further proof may be allowed in an appellate Court, see 1 Rob. (Amer. Ed.) p. 7. Sir W. Scott and sir J. Nicholl's statement of the general principles of proceeding in the admiralty.
 
 
 26
 DEXTER, contra,
 
 
 27
 Said that the motion, on behalf of the Claimants, for further proof, was entirely unexpected—that there was nothing for them to found such a prayer upon—that the claim to the 130 packages was ambiguous, the ground upon which it was made being alternative, viz. either that the goods were shipped on joint account, or that the Claimants have an equitable lien on them, on account of advances made on the consignment.
 
 
 28
 That these 130 packages were wholly British property, is clear from the papers exhibited: they were consigned by British merchants to the Claimants, with orders to sell, and remit the proceeds.
 
 
 29
 The decision as to the residue of the property in dispute, viz. the third claimed by James Thompson, depends upon his national character. That this is hostile is evident from the decision in the case of the Venus (ante p. 253,) to which decision, and the argument on behalf of the captors in that case, we beg leave to refer the Court.
 
 
 30
 To return, then, to the 130 packages. It being clear that they were British property, the only question is, whether such property is liable to condemnation, as prize of war.
 
 
 31
 The case, as stated and argued upon by the captors, is not justified by the facts; the real state of the case is materially different. The Frances was captured, not in port, but on the high seas. She did not enter the port upon the faith of the nation, but was brought in as prize.
 
 
 32
 The counsel for the Claimants, admitting the goods now in dispute, to be British property, has said that American property similarly situated would not be condemned in England; and that therefore, by the rule of reciprocity, protection ought to be extended by the American government to these goods. But even the rule of reciprocity, if it were one which this Court could enforce, would not avail the Claimants in the present case; for the British Government do not themselves respect the rule: They have captured and condemned our vessels sailing towards England, though ignorant of the war.
 
 
 33
 The declaration of war is expressed in terms as general as possible. The instructions of the president to the privateers of the United States give them a general authority to capture all property liable to capture by the laws of war.
 
 
 34
 The public faith was not pledged so as to protect this vessel. If it was pledged to repeal the non-intercourse law, there was no pledge that war should not be declared; and we claim condemnation under the declaration of war.
 
 
 35
 As to the president's instructions of 26th August, it appears that they were issued only two days previous to the capture of the Frances. The captors, consequently, had no notice of their existence. They sailed with instructions authorizing this capture and we contend that the new instructions were no instructions to these captors, until they had received notice of their being in force.
 
 
 36
 It has been said, on the part of the Appellants, that if their claim is rejected, the United States, and not the captors, will be entitled to the property. We reply that the United States have now abandoned their claim; so that the property, if condemned, must be condemned to the captors.
 
 
 37
 HARPER, for Appellants.
 
 
 38
 The reasons on which we ground our prayer for further proof, are the following.
 
 
 39
 1st. Certain bales of carpeting appear, by the invoice and bill of lading, to be the property of Steele. In the letter of 13th July, 1812, from James Thompson to Steele, they are stated to be a consignment. The further proof which we would offer, in regard to this apparent inconsistency, goes to show that upon these goods, although stated to be consigned to Steele, James Thompson & Co. had made advances to the owners, to the amount of 1000l. sterling, which created a lien upon the goods. This lien, we contend, was the property of James Thompson & Co. Again, certain other goods appear, in like manner, by the bill of lading and invoice, to be the property of Steele; but, by the letter, to be the property of Dalgleish and Frame and James Thompson. The further proof we offer here, is, that we were joint owners with Dalgleish and Frame.
 
 
 40
 It is a general rule of prize law, that further proof shall be allowed on an appeal, where the preparatory evidence was doubtful or ambiguous. The present case, we conceive, comes within this rule.
 
 
 41
 DEXTER, contra.
 
 
 42
 On this point of further proof, cited the two following cases. 6 Rob. 24. (Amer. Ed.) The Marianna—to show that an equitable lien is no ground of restitution in prize causes—and 5 Rob. 196. The Tohago, where it is decided that a bottomry bond given in time of peace, gives no such title to the obligee as well enable him to support a claim for restitution after a declaration of war. He contended that a captor takes cum onere, only when the onus is visible and direct.
 
 
 43
 PINKNEY, same side.
 
 
 44
 Further proof, under the circumstances of this case, ought not to be allowed. The goods were shipped when war was expected. The intention of the shipper was to give a neutral character to the property. James Thompson knew the facts relative to the transaction as well when he made the shipment, as now. He had reason to expect and did expect war: Hence the color given to the transaction. If the Court allows further proof in a case like this, they will hereafter be inundated with fraud and perjury. It is a general rule of the prize Courts, that further proof which goes to contradict the ship's papers, shall not be admitted. If there had been really an American interest in this case, it was James Thompson's duty as well as interest to let it appear upon the ship's papers. The original claim, of the Appellants was stated in the alternative—either they had a lien on the goods for money advanced by them through James Thompson, or the goods were consigned to them on joint account.
 
 
 45
 The heading of the invoices was false, by their own admission. A letter appears among the papers in this cause, from Robert Sterling, junr. who had property on board, shipped in the name of Wm. Steele: this letter was evidently written in contemplation of war. James Thompson's letter of 13th July, contains a list of goods consigned, in contradistinction to the goods belonging to the firm. The goods in question are among the consignments. By James Thompson's letter of 14th July, it appears that he knew of the war. From a second letter of Robert Sterling, junr. dated 15th July, it is evident that he also knew of the war. In contradiction to such documents, further proof ought not to be admitted.
 
 
 46
 HARPER, in reply.
 
 
 47
 In the cases of the bottomry bond and the lien, cited by the counsel on the opposite side, the possession of the property was in the captors. The lien was a lien without possession, it was only an incumbrance. But here, the thing was in possession of him who had the lien: The property was vested, so far as the lien extended for the advances. Steele was Thompson's agent, and might have retained the goods until the advances were repaid.
 
 
 48
 Although war was feared, peace was confidently expected. There was no motive for giving a neutral character to the property. No fraud was intended. There was no intention to defeat the non-intercourse law. Besides, an intent, even if it existed, to defeat a municipal law, is no ground for refusing further proof.
 
 
 49
 The letters referred to by the counsel for the captors, went with the invoices; and the accidental ambiguity which seems to exist in the papers was owing to the hurry occasioned by the endeavor to get the goods first to market, and to obtain the bounty on exportation.
 
 
 50
 DEXTER. In the cases cited, the property was not more in the belligerent captor, than it was in the present case:—These goods never were in possession of the consignee;—They were captured in the hands of the shipper:—They were not shipped as the property of James Thompson & Co. but as the property of the Scotch merchants.
 
 
 51
 IRVING, cited 1 Rob. 86. The Bernon, on the point of further proof.
 
 Monday, March 7th.
 
 52
 IRVING. As to the national character of James Thompson. It appears, from the testimony in this case, that James Thompson is a native of Scotland, that he came to the United States in 1793, was naturalized in 1797, and, in 1801, returned to Scotland where he continued to reside as a merchant, till some time subsequent to the declaration of war.
 
 
 53
 Naturalization, under the laws of the United States, confers upon the subject of it all the rights and privileges of a native citizen, excepting that of becoming president of the United States. He has, therefore, the same right to leave this country and go abroad which a native citizen possesses. The law of England is the same in this respect. When is the hostile character to he fixed upon him? Not until a war breaks out between the two countries, and he continues, notwithstanding, to reside and carry on a hostile trade with the enemy country. 2 Cranch, 120, Murray v. The Charming Betsy. A citizen, whether native or naturalized, surprised in a foreign country by a war, has a right to a reasonable time to withdraw his effects. 4 Rob. 161, 195. Madonna delle Gracie. In Mr. Johnson's case (1 Rob. 17, 12, The Indian Chief) his engagements to his creditors were considered by the Court as a sufficient justification of his residence in Great Britain, and his property was restored. On the point of reasonable time to withdraw, see 5 Rob. 90, The Ocean. 1 Rob. 165, 196, The Hoop. 4 Rob. 191, 232, The Dree Gebroeders. Vattel, B. 3, ch. 4, § 63.
 
 
 54
 Expectation of peace justifies delay in an enemy country, or explains the quo animo of the resident. 5 Rob. 60, The Diana.
 
 
 55
 In Bell v. Gilson, 1 Bos. and Pul. 355, it is decided that the goods of a British subject purchased in an enemy's country after the commencement of hostilities, may, under certain circumstances, be sent to England. This decision, though now over-ruled in that country, in the case of Potts v. Bell, 8 T. R. 548, has not been overruled here.
 
 
 56
 The liberty to withdraw property in case of war, is expressly recognized by various treaties, which fix the time for withdrawing. See, among others, the treaty of 1794, between his Britannic majesty and the United States, art. 26. But these treaties do not create the principle.
 
 
 57
 If, then, we allow time to an enemy to withdraw his effects, shall we not allow at least the same indulgence to our own citizens?
 
 
 58
 A cruizer cannot capture for violation of a municipal law. The seizure for a violation of the non-intercourse act is directed to be by the collectors; the action for the recovery of the penalties and forfeitures arising under the act is to be debt, and the proceedings generally are to be in conformity with the act of 2d March, 1799, to regulate the collection of duties on imports and tonnage. But where a statute gives a particular form of action, that form must be pursued. Act of congress of March 1st, 1809, § 8, and 18. (Laws U.S. vol. 9, p. 248, 254.) Act of March 2d, 1799, § 67, 68, 69, 88, 91. (Laws U. S. vol. 4, p. 389, 390, 427, 431. Bac. Abr. vol. 4, p. 654, tit. Statute, K.
 
 
 59
 Saturday, March 12th. Absent. LIVINGSTON, J.
 
 
 60
 MARSHALL, Ch. J. after stating the facts of the case, delivered the opinion of the Court as follows:
 
 
 61
 The rights of James Thompson depend entirely on his national commercial character; which is decided by the opinion given in the case of the Venus, (ante p. 253.)
 
 
 62
 The sentence of condemnation pronounced in the Circuit Court, as to James Thompson's claim, is affirmed.
 
 
 63
 The original evidence is very strong to prove that the shipment made by Dalgleish and Frame was entirely a consignment. The whole letter of the 13th of July confirms this idea. It is scarcely credible that the property of Dalgleish and Frame would have been placed on the list of consignments without a note upon it, had it been shipped on joint account. The hurry of business will not excuse or account for this omission. The proposition of Dalgleish and Frame is stated to have been made on the 27th of June, and to have been accepted on the 1st of July. The letters of Thompson to Steele are written on the 13th and 17th of July, when this shipment is treated as being altogether a consignment. The hurry could not have been such as to account for a mis-statement of the fact. There is, too, something mysterious in the manner in which the papers, offered as additional proof, reached Mr. Steele. That they should not have been accompanied by a letter, nor bear any marks of coming from abroad, is singular.
 
 
 64
 Further proof is not admitted, and the sentence is affirmed.
 
 
 65
 Wednesday, March 16th. Absent. MARSHALL, Ch. J.
 
 
 66
 WASHINGTON, J. as to the opinion of the Court on the question of lien, referred to the opinion delivered in the case of the Frances, (Irvin's claim, post. p. ___) which he said was precisely within the principle of the present case.